UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAWN E. IRISH, | ) |
| Plaintiff, | ) |
| v. | ) Docket No. |
| CRAIG S. IRISH, PEBBLE NUCLEAR, INC. and ARON SEIKEN | ) JURY TRIAL DEMANDED |
| Defendants. | ) |

## COMPLAINT

Plaintiff Dawn E. Irish ("Dawn") complains against Defendants Craig S. Irish ("Craig"), Pebble Nuclear, Inc. fka Nuclear Logistics, Inc. ("NLI"), and Aron Seiken ("Seiken") as follows:

## INTRODUCTION

1. Dawn brings this action for damages based upon Defendants' wrongful and fraudulent conduct in connection with the negotiation of the separation agreement between Dawn and Craig ("Separation Agreement" or "Agreement"), and in connection with the sale of NLI to AZZ Corporation ("AZZ"). Dawn and Craig were divorced effective January 21, 2010. Pursuant to the parties' Separation Agreement, which was incorporated into but did not merge with their divorce decree, Craig committed to pay to Dawn 20% of whatever compensation he received in connection with the sale of NLI. Subsequent events reveal that Craig, aided and abetted by Defendants Seiken and NLI, had defrauded Dawn by making material misrepresentations and concealing income and assets from her in connection with the negotiation of that Agreement, inducing her to accept less than she was lawfully entitled to. To make matters much worse, in direct contravention of the already one-sided Agreement he fraudulently

obtained, and again aided and abetted by Seiken and NLI, Craig has since manipulated the form of his compensation from the sale of NLI, and fraudulently concealed the magnitude of the compensation he received in connection with that sale specifically to avoid paying Dawn her share pursuant to the Agreement.

## PARTIES

2. Plaintiff Dawn Irish is an individual residing at 27 Linwood Street, Chelmsford, Massachusetts, 01824.

3. Defendant Craig Irish is an individual residing at 19319 La Serena Drive, Fort Myers, Florida, 33967.

4. Defendant Pebble Nuclear, Inc., formerly known as Nuclear Logistics Inc., is a Texas corporation with a principal place of business in Fort Worth, Texas.

5. Defendant Aron Seiken is an individual residing in Fort Worth, Texas. At all relevant times Mr. Seiken has been the President, majority shareholder and a director of NLI.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) and the fact that the amount in controversy exceeds $75,000.

7. This Court has personal jurisdiction over the Defendants pursuant to M.G.L. c. 223A, Section 3.

8. Craig entered into the challenged agreement in Massachusetts, in which he assents to jurisdiction in Massachusetts. Craig also owns a home in Dennis, Massachusetts.

9. NLI does business with the nuclear facility in Plymouth, Massachusetts. Defendant Seiken is the President and primary shareholder of NLI. Upon information and belief,

both NLI and Seiken have had substantial business dealings in the Commonwealth of Massachusetts and with its residents.

10. Defendants Seiken and NLI intentionally committed tortious activity as described herein, which was calculated to target, injure and defraud a Massachusetts resident. Defendants knew that the brunt of Plaintiff's injury would be felt in Massachusetts.

11. Venue in the District of Massachusetts is appropriate pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this claim occurred in Massachusetts and/or a substantial part of property that is the subject of the action is situated in Massachusetts.

## FACTS APPLICABLE TO ALL COUNTS

12. On October 3, 1992, Plaintiff Dawn and Defendant Craig were married.

13. At the time, Craig had recently graduated from college and Dawn was just completing her college education. The couple planned a life together.

14. Craig and Dawn were extremely goal oriented. Craig often referred to them as "Team Irish." They set and achieved financial objectives throughout the course of their marriage and planned for a comfortable retirement someday.

15. In 1994, Craig joined Defendant NLI. Prior to its acquisition in 2012 by AZZ, NLI was the largest third-party supplier of nuclear safety-related equipment in the world, and a major provider of safety-related equipment maintenance.

16. Craig was successful at NLI. He quickly became an indispensable member of NLI, and was compensated accordingly.

17.   Aron Seiken is and was at all relevant times the President and majority shareholder of NLI. Craig and Seiken worked closely together and Craig and Seiken together made the most important strategic business decisions for the Company.

18.   Craig worked hard and traveled constantly. As a result, Dawn was responsible for maintaining the household and spent the majority of her nights alone. Dawn's support in taking care of all of the other aspects of their life was critical to Craig's success at NLI.

19.   The couple chose not to have children. They managed their money carefully and used Dawn's income as their "play money," while saving carefully for their planned retirement.

20.   By 2009, Craig had at least a six (6) equity point interest in NLI, amounting to 120 shares of the 2000 issued shares of common stock. The couple fully expected that Craig's equity interest in NLI would become a major component of their retirement funds. Craig's equity interest was their single largest marital asset.

21.   On or about February 3, 2009, after nearly seventeen years of marriage, an irreparable breakdown occurred in Craig and Dawn's relationship.

## CRAIG'S FRAUD IN CONNECTION WITH THE NEGOTIATION OF THE SEPARATION AGREEMENT

22.   In connection with the negotiation of the Separation Agreement, both parties were obligated to fully and accurately disclose their income and assets to each other and to file a sworn statement with the Court, averring that they had fully and accurately disclosed their assets.

23.   Upon information and belief based upon the subsequent events described herein, Craig fraudulently concealed significant assets and income in his financial statement.

24.   First, Craig represented to Dawn that he held 6 "equity points" in NLI (i.e., that he owned 6% of the company). In connection with the sale of NLI, Craig now fraudulently

claims that he owns only 4% of the Company, and that he in fact owned only 4% at the time of the negotiation and execution of the Separation Agreement.

25. Upon information and belief, Craig always had some form of phantom equity arrangement with Seiken, such that he would receive a significantly larger share of the proceeds of the sale of NLI than simply 4% or even 6%. Craig knew this when he falsely represented to Dawn that he had only a 6% interest, and plainly knows this now as he fraudulently claims to have only had 4%. In fact, the many millions of dollars Craig has received from the sale of NLI amounts to significantly more than 4% or even 6% of the company.

26. Second, Craig either concealed cash, assets or a known, imminent bonus or other income from Dawn during the negotiation of the Separation Agreement.

27. Third, Craig knowingly and materially understated his weekly income on his sworn financial statement.

28. During the weeks leading up to the execution of the Separation Agreement, Craig also repeatedly and falsely represented to Dawn that the division of the assets in the divorce would leave him without funds sufficient to buy a home.

29. For example and without limitation, Craig falsely represented to Dawn in an email dated November 12, 2009, that: "Based on all the things I need to do to meet this agreement, plus the $12k+ a year I'm giving my parents, plus my own bills I will never be able to leave the Cape house unless the company sells."

30. In another email Craig sent to Dawn on or about November 17, 2009, he falsely represented to her that "[m]y income has reached its highest point. It may go up and down 3 - 5%, but it is maxed out."

31. Within months after executing the Separation Agreement, Craig purchased a home in Florida for approximately $700,000, taking out a mortgage for only approximately half that amount.

32. Craig did not disclose sufficient liquid, non-retirement assets on his financial statement to explain how he could have made this purchase. On the contrary, Craig repeatedly and falsely represented that he lacked sufficient assets or income to make this purchase.

33. Accordingly, on information and belief, Craig concealed both assets and income from Dawn in connection with the negotiation of the Separation Agreement. Craig's financial statement, which he signed under oath on or about January 21, 2010 was knowingly, intentionally, and materially false and misleading.

34. Craig also contemporaneously made other knowing false statements to Dawn in connection with the negotiation of the Separation Agreement, both orally and in writing.

35. Without limitation, during the negotiations, Craig falsely represented to Dawn that he could not provide to her information with which to value NLI. He falsely claimed that Seiken might fire him if she pressed for more information. In truth, however, Seiken was working with Craig to stonewall and defraud Dawn.

36. Upon information and belief based upon the facts and circumstances described in this Complaint, Craig's statement was knowingly false when made, and NLI and Seiken aided and abetted him in making it.

37. Upon information and belief based upon the facts and circumstances described in this Complaint, Craig's statements about his income and assets during the negotiation of the Separation Agreement were knowingly false when made.

## THE SEPARATION AGREEMENT

38. In good faith and in reasonable reliance on Craig's false statements, Dawn accepted an agreement guaranteeing her only twenty (20) percent of Craig's share in NLI, payable at the time of the sale of the Company. See Agreement § 8. All other (known) assets were divided equally. See Agreement Schedule A.

39. Dawn relied on Craig's truthfulness and good faith in making this deal. Dawn reasonably relied upon the false statements Craig made to induce her to enter into an Agreement that was in fact detrimental to her interests.

40. As a result of Dawn's reliance on Craig's false statements, she has suffered damages by agreeing to acept a smaller share of the marital assets and income than she was lawfully entitled to receive.

41. On January 21, 2010, Craig and Dawn Irish executed the Separation Agreement, attached hereto as **Exhibit A.**

42. To effectuate the Agreement with regard to Craig's equity in NLI, the Parties also executed an Escrow Agreement, pursuant to which Craig was obligated to deposit 24 shares of NLI stock into Escrow. A true copy of the Escrow Agreement is attached as **Exhibit B.**

43. By the terms of the Agreement, it was incorporated into the divorce decree, but did not merge into the decree.

44. On or about January 21, 2010, the Middlesex Superior Court entered a divorce decree ending the marriage between Craig and Dawn, and incorporating the Separation Agreement by reference.

## DEFENDANTS' FRAUD, BAD FAITH AND UNFAIR DEALING
## AFTER THE EXECUTION OF THE SEPARATION AGREEMENT

45.     After fraudulently inducing Dawn to enter into the Separation Agreement, Craig, still unsatisfied with his wrongdoing, embarked on a fraudulent, bad faith campaign to deny her even the diminished share of the marital assets to which the Separation Agreement entitled her.

46.     Craig's fraudulent, bad faith maneuvers to defraud and otherwise injure Dawn have depended in large part on the active participation of Seiken and NLI, who have conspired with Craig and aided and abetted him in perpetrating the wrongdoing described herein.

47.     Among other things, the Separation Agreement explicitly provides that Craig ("HUSBAND") "shall do nothing to deprive WIFE [Dawn] of the benefits intended by this agreement, including, but not limited to . . . . entering into any agreement intended to diminish WIFE's share of any compensation paid for HUSBAND's interest in the Company."

48.     The intent of the parties in entering into the Separation Agreement with regard to Craig's share of NLI was that Dawn would receive 20% of whatever Craig received in connection with the sale of NLI.

49.     Upon information and belief, no later than late 2011, NLI began negotiations to be acquired by AZZ, Inc. ("AZZ").

50.     In connection with the AZZ acquisition, and in direct breach of the express terms of the Separation Agreement, and in bad faith, Craig entered into a series of agreements that were intended to diminish Dawn's share of the proceeds of the sale of NLI, all with the knowing and intentional help of Seiken and NLI.

51.     Defendant Seikin, and by and through him NLI, at all times had actual knowledge of Craig's obligations to Dawn, and knowingly and intentionally conspired with and aided and

8

abetted Craig in his unlawful, bad faith manipulation of his compensation from the sale of NLI so as to avoid his lawful obligations to Dawn.

52. Specifically, but without limitation, on January 17, 2012, Seiken, NLI and Craig agreed that Craig would receive a "bonus" of some $3.4 million in the form of a promissory note, allegedly for employment compensation for 2011.

53. At no time in the prior 18 years had Craig ever received more than a fraction of this sum as a bonus, and never had he been obligated to accept a bonus in the form of a promissory note.

54. On information and belief, Craig, NLI and Seiken agreed to this promissory note in order to honor part of Craig's phantom equity arrangement, and ensure that Craig would receive some of the share of the consideration for the sale of NLI that Seiken had promised him.

55. The note is only part of the Defendants' knowingly and intentionally fraudulent scheme to transfer funds to Craig in a manner unlawfully intended to avoid sharing with Dawn her share of the consideration from the sale of NLI as required by the Separation Agreement.

56. On or about June 1, 2012, AZZ and NLI closed the acquisition deal. AZZ paid a total of $104,800,000 for NLI's assets, comprised of $80,000,000 in cash, approximately $4,800,000 million in debt notes, and $20,000,000 million in a contingent payout subject to NLI's future financial performance. AZZ further assumed NLI's liabilities in connection with the transaction.

57. Seiken and Craig are both parties to the acquisition agreement with AZZ as the Company's two "principal shareholders." Craig could not have accomplished any of the bad faith manipulation of the proceeds of the sale of NLI to AZZ described herein without Seiken's and NLI's active participation and knowing provision of substantial assistance.

58. On or about October 9, 2012, Craig wired to Dawn the sum of $400,000 in purported full payment of the "majority" of his obligations under the Separation Agreement.

59. In connection with the payment, Craig sent Dawn an email that contained false statements regarding the net proceeds of the sale of NLI and his share of them.

60. When Dawn asked for further information about the net proceeds of the sale of NLI and Craig's share of them, on October 10, 2012 Craig falsely represented that he did not have access to more information and forwarded to Dawn a letter on Pebble Nuclear, Inc. letterhead, over Seiken's signature block, repeating falsehoods about the net proceeds of the sale of NLI and Craig's share in them. Pebble Nuclear, Inc. is the successor in interest to NLI, formed in connection with the sale of NLI's assets to AZZ.

61. Upon information and belief, Seiken and NLI provided this false and misleading letter to Craig specifically for the purpose of trying to mislead Dawn into accepting the unlawfully diminished share of the proceeds of the sale of NLI that Craig had determined he would pay her.

62. In response to further inquiry through counsel, Craig again made misrepresentations to Dawn regarding the proceeds of the sale of NLI, his share in them, and his access to further information about the sale and his compensation from it.

63. Craig falsely represented to Dawn that his share of the proceeds of the NLI acquisition by AZZ amounted to $1.6 million, of which he wired $400,000.

64. Contrary to Craig's representation, the publicly available documents regarding the acquisition show that he received millions more than that from the sale of NLI to AZZ, including at least:

   a. Approximately $3.4 million in repayment of the fraudulent promissory note;

    b. A "bonus" out of the sale proceeds;

    c. A share of the Shareholders Equity True Up under the Acquisition Agreement; and

    d. A share of the proceeds of the $20 million Earn Out.

65. Upon information and belief, Craig received no less than $10 million in connection with the sale of the Company and stands to receive more still.

66. Based on a $10 million payout to Craig from the sale of NLI, Dawn should have received $2 million under the terms of the Agreement. Instead, she has received only $400,000.

## OTHER WRONGDOING BY CRAIG

67. To add insult to injury, for the past two years, when paying Dawn her share of the shareholder distributions as is required under the Separation Agreement, Craig has wrongfully been deducting his taxes and tax preparation fees from his payment to Dawn.

68. In both 2010 and 2011, Craig cheated Dawn with regard to her share of the "K-1 distribution" from the Company each year.

69. Pursuant to the express terms of the Escrow Agreement, Craig was obligated to pay to Dawn "for each share of NLI stock held by the Escrow Agent, a payment equal to the amount of any qualified distribution made to the remaining holders of Common Stock, such payment to be made in the same amount and at the same time as the corresponding qualified distribution."

70. Craig violated this term by instead deducting his income taxes and tax preparation fee from the amounts he should have paid to Dawn.

71. As a result, in 2010, he paid her nothing when her proportionate share, assuming he truthfully told her the distribution was $26,856.05, should have been no less than $5,371.21 (assuming Dawn had 20% of a 6% interest), or $8,056.82 (if he only had 4% as he now claims).

72. In 2011, he paid her only $412.90, when her proportionate share, again assuming he truthfully disclosed the amount of the distribution of $58,106.50, was at least $11,6121.30 and $17,431.95 using Craig's current claims.

## COUNT I
## FRAUD (v. Craig Irish)

73. Plaintiff repeats the foregoing allegations as if fully set forth herein.

74. As more fully set forth herein, Craig has repeatedly, knowingly and intentionally made material misrepresentations and omitted material information that he had a duty to disclose to Dawn, for the specific purpose of first inducing her to accept less than she was entitled to in the Separation Agreement, and then to deny her even the diminished amounts to which she is entitled under the terms of that Agreement and to conceal his fraud from her.

75. Dawn reasonably relied upon Craig's fraudulent misrepresentations and omissions to her detriment.

76. Craig's fraud has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

## COUNT II
## BREACH OF CONTRACT (v. Craig Irish)

77. Plaintiff repeats the foregoing allegations as if fully set forth herein.

78. Dawn and Craig are parties to an express written contract, namely the Separation Agreement.

79. By his conduct described herein, Craig has repeatedly breached the Agreement.

80. Craig's breach of the Separation Agreement has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

## COUNT III
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING (v. Craig Irish)

81. Plaintiff repeats the foregoing allegations as if fully set forth herein.

82. Dawn and Craig are parties to a contract, namely the Separation Agreement.

83. As a contract, the Separation Agreement contains within it an implied covenant of good faith and fair dealing.

84. Craig had a duty of good faith and fair dealing, requiring him to act in such a manner so as not to deny Dawn the benefits of the contract.

85. Through the conduct as described herein, Craig has acted unreasonably and in bad faith in breach of the duty of good faith and fair dealing.

86. Craig's breach of the duty of good faith and fair dealing has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

## COUNT IV
## CONVERSION (v. Craig Irish)

87. Plaintiff repeats the foregoing allegations as if fully set forth herein.

88. Upon the sale of NLI, Dawn had a right to immediate possession under the Separation Agreement to, among other things, 20% of the compensation received by Craig in connection with the sale of NLI.

89. Craig has unlawfully and wrongfully misappropriated the sums due to Dawn under to the Separation Agreement, and instead has converted those sums to his own use by exercising dominion over the sums inconsistent with Dawn's rights.

90. Craig continues to wrongfully assume and exercise control over the sums that he has wrongfully retained and misappropriated from Dawn.

91. Craig's conversion has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY (v. Craig Irish)

92. Plaintiff repeats the foregoing allegations as if fully set forth herein.

93. Craig owed a fiduciary duty to Dawn when negotiating the Separation Agreement.

94. Through his conduct described herein, including but not limited to concealing assets and income from her and otherwise misleading her when negotiating the Separation Agreement, Craig breached his fiduciary duty to Dawn.

95. Craig's breach of fiduciary duty, has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

## COUNT VI
## INTENTIONAL INTERFERENCE WITH CONTRACT
## (v. Aron Seiken and NLI)

96. Plaintiff repeats the foregoing allegations as if fully set forth herein.

97. Dawn and Craig are parties to a contract, namely the Separation Agreement.

98. At all relevant times, Defendants Mr. Seiken and NLI, through its directors, knew or should have known that Dawn and Craig were parties to the Agreement, and knew or should have known the parties' respective rights and obligations.

99. Defendants Seiken and NLI, with knowledge of Craig and Dawn's contractual obligations, intentionally interfered with those contractual relations by, among other things, manipulating the form of Craig's compensation from the sale of NLI and concealing the

magnitude of such compensation, and assisting Craig to breach his contractual obligations and otherwise defraud Dawn.

100. Defendants' Seiken and NLI's motive in interfering with the contract was improper.

101. Defendants Seiken and NLI's intentional interference with the contract, has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

### COUNT VII – AIDING AND ABETTING FRAUD (v. Mr. Seiken and NLI)

102. Plaintiff repeats the foregoing allegations as if fully set forth herein.

103. At all relevant times, Defendants Seiken and NLI, through its directors, had actual knowledge of the relationship between Craig and Dawn and Craig's efforts to cheat and defraud her.

104. Seiken and NLI knew that Craig was defrauding and breaching his duties to Dawn and intended to and did assist and participate with Craig in his efforts to cheat and defraud Dawn.

105. Defendants Seiken and NLI's substantial participation in Craig's fraud has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages.

### COUNT VIII --FRAUDULENT TRANSFER IN VIOLATION OF THE MASSACHUSETTS UNIFORM FRAUDULENT TRANSFERS ACT (UFTA) (v. all Defendants)

106. Plaintiff repeats the foregoing allegations as if fully set forth herein.

107. Dawn is a creditor within the meaning of the UFTA.

108. Upon information and belief, in violation of the UFTA, Defendants, with actual intent to hinder, delay or defraud Dawn and in an effort to prevent her from collecting the assets

properly due to her under the Separation Agreement, made a series of fraudulent transfers to Craig.

109. These conveyances include, without limitation:

   a. The fraudulent promissory note to Craig dated January 17, 2010;

   b. The "bonus" to Craig in connection with the sale of NLI to AZZ; and

   c. Any other conveyances to Craig in connection with the sale of NLI to AZZ intended to diminish Dawn's share of the proceeds of the sale.

110. The aforementioned conveyances were made by Defendants with fraudulent intent in order to deprive Dawn of her rightful share under the Separation Agreement.

111. Defendants' fraudulent conveyances have caused, are continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

112. Any such transfers by the Defendants are voidable under the UFTA.

### COUNT IX --CIVIL CONSPIRACY TO COMMIT TORT– Breach of Fiduciary Duty/Conversion/Fraudulent Transfer (v. Defendants Aron Seiken and NLI)

113. Plaintiff repeats the foregoing allegations as if fully set forth herein.

114. As further set forth herein, Seiken and NLI combined and conspired with Craig to engage in multiple unlawful and fraudulent acts to the harm of Dawn.

115. Seiken and NLI formed a conspiracy in order to allow Craig to defraud and breach his contractual obligations to Dawn and to misappropriate the sums due to her under the Agreement and convert those funds for Craig own use.

116. Defendants' conspiracy to commit the aforementioned conduct has caused, is continuing to cause and threatens to cause Dawn to suffer substantial damages in an amount to be determined at trial.

WHEREFORE, Dawn Irish requests that the Court:

1. Enter judgment in Dawn's favor on all counts and award damages in an amount to be determined at trial;

2. Order equitable relief equivalent to rescission of all fraudulent transactions;

3. Award Dawn her attorneys' fees, interest and costs; and

4. Grant such other relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

DAWN IRISH,
By her attorneys,

/s/ Sean T. Carnathan
Sean T. Carnathan (BBO #636889)
scarnathan@ocmlaw.net
Michelle McNamara (BBO #662560)
O'Connor, Carnathan and Mack LLC
Landmark One
1 Van De Graaff Drive
Suite 104
Burlington, Massachusetts 01803
Tel. 781-359-9000

Dated: November 15, 2012

4823-2187-4449, v. 1