UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
DAWN E. IRISH,                      )
                                    )
                Plaintiff,          )
                                    )        CIVIL ACTION
            v.                      )        NO. 12-12132-WGY
                                    )
CRAIG S. IRISH,                     )
                                    )
                Defendant.          )
_____)


FINDINGS OF FACT AND RULINGS OF LAW

YOUNG, D.J.                                        June 30, 2015

I.    **INTRODUCTION**

        This case arises out of the acrimonious 2010 divorce of the

plaintiff, Dawn E. Irish ("Ms. Irish"), and the defendant, Craig

S. Irish ("Mr. Irish") (collectively, "the Irishes").

Specifically, Ms. Irish alleges that Mr. Irish manipulated his

compensation package and failed fully to disclose his finances

in an attempt to prevent Ms. Irish from receiving what she was

due after their divorce, thus giving rise to claims for breach

of contract and breach of the covenant of good faith and fair

dealing.  The parties agreed to resolve the question of

liability on these claims at a case stated hearing[1] held on July

30, 2014.

_____

        [1] A case stated hearing is a procedure that allows the Court
to make a judgment based on the record in cases where there are

[1]

This case followed a circuitous path through both state and
federal courts to its present resolution.  The federal portion
of the case began on November 15, 2012, when Ms. Irish filed a
complaint alleging nine counts sounding in contract, tort, and
fraud against Mr. Irish and two other defendants - Aron Seiken
("Seiken") and Pebble Nuclear, Inc., formerly known as Nuclear
Logistics, Inc. ("NLI").  Compl., ECF No. 1.  At a motion
session held on March 21, 2013, the Court dismissed the claim
against Seiken because of improper venue, dismissed one of the
counts against NLI for failure to state a claim, and denied a
motion to dismiss filed by Mr. Irish.  Elec. Clerk's Notes, ECF
No. 38.  Mr. Irish subsequently filed a motion for summary
judgment, which was granted as to the fraud claim but was
otherwise denied on July 15, 2013.  Elec. Clerk's Notes, ECF No.
63.  Pursuant to an agreement between Ms. Irish and NLI, the
Court dismissed the claims against NLI on November 12, 2013.
Final J. Certain Party, ECF No. 80.  On January 22, 2014,
following a set of cross-motions for summary judgment and a
motion to dismiss for lack of jurisdiction, the Court dismissed
all remaining counts except for Count II (alleging breach of

---

minimal factual disputes.  In its review of the record, the
Court is entitled to "engage in a certain amount of factfinding,
including the drawing of inferences."  TLT Constr. Corp. v. RI,
Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United
Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d
28, 31 (1st Cir. 1995)) (internal quotation marks omitted).

contract) and Count III (alleging breach of the covenant of good faith and fair dealing), as all but the contract claims were barred by the domestic relations exception to federal subject matter jurisdiction.[2]  Elec. Clerk's Notes, ECF No. 144; Mot. Hearing Tr. 9:16-11:10, ECF No. 135.  The Court then administratively closed the case (to be reopened upon the motion of either party) to allow the claims to be resolved in the Middlesex Probate and Family Court.  Elec. Clerk's Notes, ECF No. 144; Order, ECF No. 145; Order, ECF No. 146.

---

[2] The Court's previous ruling regarding its subject matter jurisdiction over the contract claims means that there is no need to discuss the issue further in this opinion, but the Court sees fit to explain the reasoning it used in issuing an order on the matter from the bench during oral argument on these earlier motions.

The First Circuit has noted that the domestic relations exception only bars the exercise of jurisdiction over claims "to obtain, alter or end a divorce, alimony or child custody decree."  Dunn v. Cometa, 238 F.3d 38, 41 (1st Cir. 2001).

A series of cases under Massachusetts state law demonstrate that a divorce decree only obtains preclusive effect with regard to marital assets that were the subject of actual litigation.  See, e.g., Carpenter v. Carpenter, 73 Mass. App. Ct. 732, 738-740 (2009) (citing Mass. Gen. Laws ch. 208, § 34) (discussing precedent and noting that parties may file "postdivorce complaints for division of an omitted marital asset generally involving circumstances where either there was no division of the marital estate or a particular asset was omitted from the original division").  Given that Ms. Irish's claims focus on an asset that was not disclosed (and thus was not litigated in the original divorce proceeding), the Irishes' divorce judgment does not extend to the assets at the heart of this case.  Because no divorce decree has preclusive effect as to these assets, then, no judgment the Court could make with regard to these assets would "alter a divorce decree" in such a way that would bring the matter within the domestic relations exception to federal subject matter jurisdiction.

The matter finally began approaching its present posture on May 30, 2014, when Ms. Irish filed a motion to reopen the case and set a date for trial of the remaining claims. Pl. Dawn E. Irish's Mot. Reopen Case & Set Trial Incorporated Mem. Supp., ECF No. 148; Elec. Order, ECF No. 149. At a status conference on June 12, 2014, the parties agreed to resolve the issue of liability for the remaining counts at a case stated hearing. Status Conf. Tr. 3:14-5:1, ECF No. 160. Ms. Irish filed a memorandum in support of her position on July 23, 2014. Pl.'s Case-Stated Mem. Count II (Breach Contract) & Count III (Breach Covenant Good Faith & Fair Dealing) ("Ms. Irish's Mem."), ECF No. 163. Mr. Irish filed his own memorandum the same day. Craig Irish's Mem. July 30, 2014 Case-Stated Hr'g & Supp. Mot. Exclude Reports Pl.'s Experts ("Mr. Irish's Mem."), ECF No. 166.[3] The Court held a case stated hearing on July 30, 2014 and took the matter under advisement. Elec. Clerk's Notes, ECF No. 170.

## II.  FINDINGS OF FACT

### A.  The Irishes' Marriage & Divorce

The Irishes were married in Chelmsford, Massachusetts, on October 3, 1992. Aff. Sean T. Carnathan Supp. Pl.'s Opp'n Def.

---

[3] Mr. Irish spent a substantial portion of his memorandum arguing in favor of a separate motion to exclude three expert reports submitted by Ms. Irish. Mr. Irish's Mem. 12-19; see also Craig Irish's Mot. Exclude Reports Pl.'s Experts, ECF No. 165. This motion was denied on July 30, 2014 – the same day as the case stated hearing. Elec. Order, ECF No. 171.

Craig S. Irish's Mot. Summ. ("Carnathan Aff."), Ex. 6,
Separation Agreement ("Separation Agreement") 1, ECF No. 59-6.
During the course of the marriage, Mr. Irish worked at NLI
(ultimately rising to the position of officer, director, and
part owner), and Ms. Irish maintained their home while Mr. Irish
traveled for work.  Ms. Irish's Mem. 3.  The marriage began to
deteriorate in 2008 and became irreconcilable on February 2,
2009.  Id.  Mr. Irish filed for divorce two days later on
February 4, 2009.  Id.

Judge Dorothy M. Gibson of the Middlesex Probate and Family
Court entered a judgment of divorce nisi on January 21, 2010.
Carnathan Aff., Ex. 7, J. Divorce Nisi, ECF No. 59-7.  The
judgment incorporated a Separation Agreement filed the same day,
though the Separation Agreement was not merged into the divorce
judgment.  See id.; Separation Agreement.  In addition to a
number of other provisions not relevant to the case currently at
bar, the Separation Agreement provided for an equal split of all
of the Irishes' assets with the exception of Mr. Irish's equity
in NLI.  Ms. Irish's Mem. 3 (citing Separation Agreement ¶¶ 6,
7).  At the time of the divorce, Mr. Irish represented that he
had a 6 equity point interest in NLI, translating to 120 shares.
Separation Agreement 5.[4]

---

[4] It appears that this assessment of Mr. Irish's stake in
NLI was a mistake, as both parties now seem to agree that in

It appears that going into the negotiation of the
Separation Agreement, it was very important to Ms. Irish that
she receive 20% of Mr. Irish's equity in NLI; at the parties'
conference on January 21, 2010, she produced a draft of the
Separation Agreement that explicitly gave her this 20% share.
Mr. Irish's Mem. 6.  In the final version of the Separation
Agreement, this 20% clause is crossed out, and Ms. Irish instead
was explicitly given 24 shares of NLI, representing 20% of the
120 shares in the company that Mr. Irish purportedly owned.  See
Separation Agreement 5.  Ms. Irish attests that she agreed to
strike out the clause granting her 20% of Mr. Irish's stake in
NLI because it "seemed superfluous" when set against the
explicit grant of a number of shares amounting to this 20%
interest and because Mr. Irish "had represented many times that
he would not get any more from a sale [of NLI] than his 6%
equity entitled him to."  Aff. Dawn Irish Supp. Her Mot. Summ.
J. Counts I & V Against Craig Irish ("Ms. Irish Aff.") ¶ 12, ECF
No. 86.  Because Mr. Irish was not permitted to sell his stock

reality he owned 4% of the company.  Mr. Irish's Mem. 9 n.5
(addressing mistake and citing testimony from the deposition of
Ms. Irish).  The Court does not see how this mistake is relevant
given the present posture of the case, as the difference between
4 and 6% does not appear to bear on the question of Mr. Irish's
liability as framed by Ms. Irish.  In order better to match the
briefing and the Separation Agreement, the Court will continue
to refer to Mr. Irish's claimed share as 6% - but the Court
reiterates that this choice has no bearing whatsoever on its
ultimate holding.

in NLI, the Separation Agreement transferred the 24 shares granted to Ms. Irish to an escrow account, with the Escrow Agreement becoming incorporated into the Separation Agreement itself.  See Separation Agreement 5; Aff. Elizabeth G. Crowley, Ex. C, Probate & Family Ct. Tr. 4:12-20, ECF No. 99-3.

Two other provisions of the Separation Agreement bear on the matter at bar.  First, the same paragraph of the document that grants 24 shares of NLI to Ms. Irish states that "HUSBAND further covenants and agrees that he shall do nothing to deprive WIFE of the benefits intended by this agreement, including, but not limited to . . . entering into any agreement intended to diminish WIFE's share of any compensation paid for HUSBAND's interest in [NLI]."  Separation Agreement 5-6.  Second, the Separation Agreement refers repeatedly to the Irishes' Financial Statements, which were sworn and submitted to the Middlesex Family and Probate Court approving the divorce.  See Separation Agreement 2, 5, 7; Ms. Irish's Mem. 4 (describing submission of the statements).  The Financial Statement Mr. Irish submitted and signed on January 21, 2010 – the day the Separation Agreement was approved - contains a clause stating that he "certif[ies] under the penalties of perjury that the information stated on this Financial Statement and the attached Schedules, if any, is complete, true, and accurate."  Carnathan Aff., Ex.

5, Financial Statement (Long Form) ("Fin. Statement") 20, ECF
No. 59-5.

## B. Mr. Irish's Employment & Compensation

During the Irishes' marriage, Mr. Irish worked as Vice
President of Sales for NLI, earning a sizable yearly salary in
addition to performance bonuses and his aforementioned ownership
stake.  Mr. Irish cites evidence that Ms. Irish knew in the
several years prior to the divorce that NLI could be sold to
another company, possibly leading to significant income for Mr.
Irish due to his equity stake in NLI.  See Mr. Irish's Mem. 5.

Ms. Irish's claim that she is entitled to 20% of a bonus
resulting from a sale of the company stems from a series of
communications between Mr. Irish and his accountant, Debra
Dobbins ("Dobbins"), in late January and early February 2009,
just days before Mr. Irish filed for divorce.  It appears from
the record that Mr. Irish communicated Dobbins on or around
January 29, 2009, asking her about the implications of an offer
to increase his equity share of NLI to 20%; Dobbins responded
with her advice the next day.  Pl.'s Case-Stated App'x Vol. I,
Tab 7, Emails Between Debra Dobbins and Craig Irish ("Dobbins
Emails") 299-300.[5]  Mr. Irish, Dobbins, and Seiken (Mr. Irish's

---

[5] A hard copy of these emails was submitted by Ms. Irish as
part of an appendix compiling relevant parts of the record.
While the Court has attempted to cite to electronic copies of
the appendix materials on the electronic docket as much as

boss at NLI) had a conference call discussing an increase in Mr.

Irish's equity in NLI on the morning of February 3 – the day

before Mr. Irish filed his divorce petition.  <u>See</u> <u>id.</u> at 302.

While the precise contents of that call are not in the record,

emails between Dobbins and Mr. Irish later that afternoon shed

light on what was said.  An email from Dobbins to Mr. Irish

describes the tax consequences of taking an additional 14%

equity share of the company, but it then goes on to say that:

> [T]he end result to you would be the same if the side
> agreement states that you will receive proceeds from a
> sale equivalent to being [a] 20% shareholder.  The
> year of sale, you would receive the majority as
> taxable income[.]
>
> If you were an actual 20% shareholder, that ordinary
> income is spread out over the period of years as it is
> earned in the form of K-1 income, until the company is
> sold.

<u>Id.</u> at 311.  In response, Mr. Irish said that he "think[s] this

just solidifies keeping the arrangement the same and keep[ing]

the side deal."  <u>Id.</u> at 310.  Dobbins then wrote, "My

recommendation would be to keep things the same.  Make sure your

side deal is in writing and explicit."  <u>Id.</u> at 309.  In the

final email in the chain, Mr. Irish wrote back that he agreed.

<u>Id.</u>  Ms. Irish contends that Mr. Irish never disclosed this side

deal during the course of their divorce – not even to his own

---

possible, the Dobbins emails do not appear to have been filed
electronically.

attorney – and that he repeatedly claimed that the only thing he would be due upon the sale of NLI was compensation for his 6% equity stake.  Ms. Irish's Mem. 6-7.

On April 27, 2012, NLI reached an agreement with AZZ Incorporated ("AZZ") to sell substantially all of its assets in exchange for $80,000,000 "plus an opportunity to earn another $20 million through a post-acquisition earn-out."  Ms. Irish's Mem. 7 (citing Carnathan Aff., Ex. 18, Asset Purchase Agreement, ECF No. 59-18).  The deal also meant that AZZ assumed NLI's liabilities and paid roughly $5,000,000 of debt that NLI owed to Seiken and Mr. Irish.  Id.  The parties do not contest that in the wake of NLI's sale, Mr. Irish received a payment of $21,600,000.  See Ms. Irish's Mem. 7; Mr. Irish's Mem. 3.  They disagree, however, as to how this payment ought be characterized.  Mr. Irish claims that the payment consisted of "a retention bonus for Mr. Irish to stay with NLI's acquirer, completing payout of his 2011 performance bonus, and a transaction bonus Mr. Irish was awarded in recognition of his singular efforts to increase sales and the value of the company leading up to its sale."  Mr. Irish's Mem. 3; see also id. at 4-5 (describing Mr. Irish's $5,750,000 bonus for 2011); id. at 7 (citing Seiken's deposition testimony listing the criteria he used to determine the size of the payment).  Ms. Irish, on the other hand, says that the $21,600,000 payment represented

compensation for Mr. Irish's "phantom equity" – that is to say, the fruit of Mr. Irish's "side deal" with Seiken that he purportedly accepted in lieu of boosting his equity share of NLI to 20%.  See Ms. Irish's Mem. 7.

## III. RULINGS OF LAW

### A.  Breach of Contract

Where – as is the case here – a Separation Agreement is incorporated but not merged into the judgment of divorce nisi, the Separation Agreement "shall survive and remain as an independent contract."  Mass. Gen. Laws ch. 208, § 1A; <u>see also</u> J. Divorce Nisi (stating that the Irishes' Separation Agreement is "incorporated and not merged into this Judgment [and] shall survive and have independent legal significance").  A surviving agreement "remains binding on the parties and may serve as the basis for a legal action to enforce its terms – e.g., a claim for unpaid alimony – which may be brought separate and apart from any contempt motion filed in the divorce case."  <u>Mooney</u> v. <u>Mooney</u>, 471 F.3d 246, 247 (1st Cir. 2006) (citing <u>Mansur</u> v. <u>Clark</u>, 25 Mass. App. Ct. 618 (1988)).  In such a case, the reviewing court must evaluate the Separation Agreement "according to established contract principles."  <u>Krapf</u> v. <u>Krapf</u>, 439 Mass. 97, 103 (2003).

Ms. Irish alleges that Mr. Irish breached two terms of the Separation Agreement: the term of his Financial Statement

warrantying that it represented a full and complete disclosure
of his assets and the term of the Separation Agreement stating
that he would do nothing to deprive Ms. Irish of her share of
any of Mr. Irish's compensation for his interest in NLI. Ms.
Irish's Mem. 9, 11. The Court will address each of these claims
in turn.

### 1.   Full & Complete Financial Disclosure

Ms. Irish alleges that Mr. Irish breached his warranty that
his Financial Statement was accurate and complete when he
omitted from that statement any mention of the side deal giving
him "phantom equity" equivalent to a 20% stake in NLI. Id. at
9-11.

As a predicate matter, this claim can stand only if the
Financial Statement is read to be part of the contract formed by
the Separation Agreement, despite the fact that it bears only
the signature of Mr. Irish and is not on its own terms framed as
a contract. According to Massachusetts contract law,
"interlocking documents that are part of a single transaction
and are interrelated in purpose must be read together to
effectuate the intention of the parties." Matthews v. Planning
Bd. of Brewster, 72 Mass. App. Ct. 456, 463 (2008) (internal
quotation marks and alterations omitted); see also Donoghue v.
IBC USA (Publications), Inc., 70 F.3d 206, 212 (1st Cir. 1995)
("[I]f the parties execute two or more documents, with a

manifested intent that the documents together express their
entire agreement, a court reads the documents together, rather
than construing each as if it stood alone." (citing <u>FDIC</u> v.
<u>Singh</u>, 977 F.2d 18, 21 (1st Cir. 1992)).  The Court rules that
the Financial Statement is interrelated with the Separation
Agreement and the Escrow Agreement such that it adequately
constitutes a part of the contract.  The Separation Agreement
repeatedly refers to the Financial Statement, <u>see</u> Separation
Agreement 2, 5, 7; moreover, the veracity of the Financial
Statement is a key predicate of the Separation Agreement's goal
of fully and fairly dividing the Irishes' marital property.
Accordingly, the Court rules that Ms. Irish may hold Mr. Irish
accountable for the clause of the Financial Statement stating
that his disclosures were "complete, true, and accurate."  Fin.
Statement 20.

What remains, then, is for the Court to evaluate whether
Mr. Irish's Financial Statement was not "complete, true, and
accurate" due to the fact – not disputed by the parties – that
there is no mention of any stake in NLI greater than six equity
points.  This question hinges on how the Court characterizes the
$21,600,000 payment Mr. Irish received following the sale of NLI
to AZZ.  If Mr. Irish is right that the payment was a bonus,
then he did not breach this warranty, as the payment had not
been earned at the time of the 2010 Financial Statement and thus

could not possibly be disclosed. To the contrary, if Ms. Irish is correct that Mr. Irish forged a side deal with Seiken in 2009 (prior to the dissolution of the marriage) that would functionally give him the equivalent of a 20% stake in NLI, then this is information that ought have been disclosed at the time the Separation Agreement was negotiated and signed.

Drawing inferences from the record as it sees fit – as is its duty following a case stated hearing – the Court rules that Ms. Irish has the better of the argument. While no contract evincing the "side deal" between Seiken and Mr. Irish appears in the record, several pieces of evidence in the record reasonably point to its existence. Dobbins wrote to Mr. Irish discussing a possible "side agreement [that] states that you will receive proceeds from a sale equivalent to being [a] 20% shareholder" and further stating that in "[t]he year of sale, [he] would receive the majority as taxable income." Dobbins Emails 311. Subsequently she said that Mr. Irish should make such a deal "in writing and explicit," and Mr. Irish agreed. Id. at 309. In 2012, the year that NLI was sold, Mr. Irish received a payment of $21,600,000 – a payment worth 27% of NLI's $80,000,000 purchase price, more even than the 20% share discussed with Dobbins. The Court finds it hard to believe that it is purely by chance that Mr. Irish declined to increase his equity share of the company more than threefold but just so happened to

[14]

receive a bonus commensurate with that increase upon the company's sale. Indeed, as Ms. Irish rightly points out, it would make no sense for Mr. Irish to decline this increase in equity without some sort of concrete promise that he would receive that compensation in some other form. See Ms. Irish's Mem. 6.

Ms. Irish bolsters this view of the payment with multiple expert reports. Her tax law expert concluded that the payment (viewed from a tax standpoint) consisted of disguised equity payouts and that the payment was consistent with Mr. Irish being treated as a preferred shareholder of NLI. Pl.'s Case-Stated App'x Vol. II, Tab 12, Expert Report Laura Gannon, CPA ¶¶ 11, 13. Moreover, Ms. Irish's expert in executive compensation found that the $21,600,000 payment was 3,536% to 14,715% higher than the median transaction bonuses given to top-ranked executives at publicly traded companies and was 8,163% higher than Mr. Irish's own base salary. Pl.'s Case-Stated App'x Vol. II, Tab 13, Expert Report Anthony DaSilva, Jr. ¶¶ 21-26. The compensation expert concluded that the payment was "grossly in excess of any transaction bonus granted to executives of similar standing as [Mr. Irish] . . . [and that] large transaction-related payments similar to the type [Mr. Irish] received are usually in consideration for actual or phantom ownership interests." Id. ¶ 27.

Given that the Court adopts Ms. Irish's view of the $21,600,000 payment as compensation for hidden equity in NLI, it naturally follows that Mr. Irish's failure to disclose this "side deal" meant that he had breached his promise that his Financial Statement was complete, true, and accurate. <u>Cf.</u> <u>Custom Kits Co.</u> v. <u>Tessier</u>, 83 Mass. App. Ct. 1125 (2013) (unpublished) ("The allegations in the instant case effectively assert a breach of the disclosure term by reason of [one spouse]'s concealment of diverted corporate funds.").

Mr. Irish attempts to defend against this ruling in two ways. First, he continues to claim that the $21,600,000 payment was a bonus, but what little evidence he produces to support this view is indirect – and critically, he does nothing to offer any explanation for the Dobbins emails discussing the choice between taking a 20% equity stake in NLI or maintaining a "side deal" with Seiken. <u>See</u> Mr. Irish's Mem. 4-7. Accordingly, the Court sees no reason to credit Mr. Irish's portrayal of the payment over the one offered by Ms. Irish. Second, Mr. Irish argues that the Separation Agreement is clear that Ms. Irish is entitled only to 1.2 equity points in NLI and cannot claim any portion of whatever bonuses Mr. Irish would receive; he says that his failure to give her more than that cannot be construed as a breach of the contract, and he portrays her

characterization of his $21,600,000 payment as an attempt to rewrite the explicit terms of the contract.  See id. at 8-11.

While Mr. Irish is correct that the Separation Agreement explicitly provides that Ms. Irish was to receive only a 1.2% equity stake in NLI, this is not an adequate defense against Ms. Irish's claim for breach of contract.  As a practical matter, the clause granting Ms. Irish this 1.2% stake is largely irrelevant to the question of whether Mr. Irish's Financial Statement was complete, true, and accurate, and it is this latter question that lies at the heart of the liability question now before the Court.  More critically, the record suggests – and the Court so finds – that it was Mr. Irish's repeated claim that he only held a 6% share of NLI that led Ms. Irish to agree to a term granting her a 1.2% stake (that is to say, 20% of the 6% interest purportedly held by Mr. Irish) rather than the clause she originally sought granting her 20% of Mr. Irish's interest (whatever that interest may be).  See Ms. Irish Aff. ¶ 12.  Put differently, Mr. Irish cannot fairly use this particular term as a defense against the claim for breach of the disclosure term of the contract when the term he attempts to use as a defense would not have existed in its present form without that very breach.  Cf. Knox v. Remick, 371 Mass. 433, 437 (1976) ("[S]pecific performance of an agreement concerning support payments might be denied where the plaintiff had not complied

with some other provision in the separation agreement.")
Accordingly, the Court rules that Mr. Irish has breached the
term of his contract with Ms. Irish stating that his Financial
Statement was complete, true, and accurate.

### 2. Depriving Ms. Irish of Benefits

Ms. Irish also alleges that Mr. Irish breached the term of
the Separation Agreement that reads as follows: "HUSBAND further
covenants and agrees that he shall do nothing to deprive WIFE of
the benefits intended by this agreement, including, but not
limited to . . . entering into any agreement intended to
diminish WIFE's share of any compensation paid for HUSBAND's
interest in [NLI]." Ms. Irish's Mem. 11 (alterations added)
(quoting Separation Agreement 5-6). Given that the Court has
already found that Mr. Irish structured his compensation to
camouflage a quasi-equity share in NLI as a bonus, the remaining
question is merely whether Mr. Irish's "side deal" qualified as
conduct that deprived Ms. Irish of the benefits intended by the
agreement.

Ms. Irish offers relatively scant argument on this point,
noting simply that Mr. Irish had "complete control over the form
of his payout from the sale of NLI." Id. The clear thrust of
her contention is that by structuring his compensation so as to
substitute "phantom equity" for actual equity, Mr. Irish
wrongfully and intentionally limited the portion of his

compensation from which Ms. Irish would draw her share – thus

falling squarely within the Separation Agreement's provision

banning him from "entering into any agreement intended to

diminish WIFE's share of any compensation paid for HUSBAND's

interest in [NLI]." See id.

In addition to the arguments debunked above regarding the

clause granting Ms. Irish a 1.2% stake in NLI, Mr. Irish offers

one major rebuttal to the claim now being discussed: he claims

that because Ms. Irish got the same compensation per share that

every other shareholder in NLI received, Mr. Irish did nothing

to "'diminish' the compensation Ms. Irish received for her NLI

stock." Mr. Irish's Mem. 6; see also id. at 10. Because his

"bonus" was given in recognition of his efforts to increase the

stock's value for all shareholders, Mr. Irish contends, the

Court cannot reasonably say that the payment "diluted" Ms.

Irish's shares. Id. at 6, 10.

Ms. Irish again has the better of the argument. Mr.

Irish's defense rests on a misreading of the contract term at

issue. He argues that he did nothing to diminish the value of

Ms. Irish's share of NLI – but this is not what the Separation

Agreement forbids. Rather, it forbids him from doing anything

to diminish Ms. Irish's share of Mr. Irish's interest in NLI.

While Mr. Irish is right that Ms. Irish received the same

compensation as any other shareholder, the relevant term of the

Separation Agreement is less concerned with Ms. Irish's
treatment relative to other shareholders than it is concerned
with her treatment relative to Mr. Irish himself. The Court has
already found that Mr. Irish agreed to a "side deal" that
functionally compensated him as though he were the holder of a
20% stake in NLI while representing to Ms. Irish that he only
held a 6% stake; because this representation led Ms. Irish to
accept a stake in NLI that was a smaller fraction of Mr. Irish's
interest than she expected, the Court rules that Mr. Irish has
breached the clause of the Separation Agreement at issue here.

**B.    Breach of Covenant of Good Faith & Fair Dealing**

In addition to her breach of contract claims, Ms. Irish
also claims that Mr. Irish has breached the covenant of good
faith and fair dealing. Ms. Irish's Mem. 12. "[S]pouses who
enter into agreements with each other are held to standards
higher than those we tolerate in the arm's-length transactions
of the marketplace. Parties to a separation agreement stand as
fiduciaries to each other, and will be held to the highest
standards of good faith and fair dealing in the performance of
their contractual obligations." Krapf, 439 Mass. at 103. A
party need not breach an explicit term of the underlying
contract in order to breach the covenant of good faith; rather,
"[t]he essential inquiry is whether the challenged conduct
conformed to the parties' reasonable understanding of

performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." Speakman v. Allmerica Fin. Life Ins. & Annuity Co., 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (Saylor, J.). In evaluating the so-called "spirit of the bargain," the Court may look both to "the entire agreement itself and [to] the context of its execution." Krapf, 439 Mass. at 105. Accordingly, the duty of good faith extends to "both the execution and the performance of a surviving separation agreement." Id. at 107.

Ms. Irish makes a straightforward case that Mr. Irish has breached this duty of good faith: she argues that he accepted a secret deal to disguise an increased interest in NLI as a bonus and that he subsequently dissembled about this interest in an attempt to minimize Ms. Irish's own compensation. Ms. Irish's Mem. 15. She further notes that it would be wholly unreasonable for her to have agreed to receive what amounts to 2% of Mr. Irish's ownership interest in NLI; she suggests that this is indicative of the fact that her reasonable expectation of the agreement was that she was receiving 20% of his stake in the company. Id. at 14-15.

Mr. Irish argues in response that although the covenant of good faith and fair dealing exists in every contract under Massachusetts law, it "may not be invoked to create rights and

duties not otherwise provided for in the existing contractual relationship." Mr. Irish's Mem. 11 (quoting <u>HSBC Realty Credit Corp. (USA)</u> v. <u>O'Neill</u>, 745 F.3d 564, 575 (1st Cir. 2014)) (internal quotation marks omitted). He then claims that because no terms in the Separation Agreement entitle Ms. Irish to a share of any bonus he received, she cannot use the covenant of good faith to get a bigger share of Mr. Irish's compensation than that to which she is otherwise entitled. <u>Id.</u> at 11-12.[6] Anticipating this line of defense, Ms. Irish argues that it was Mr. Irish's bad faith that led to the existence of the term granting her a 1.2% stake in NLI in the first place; because it was Mr. Irish's bad faith that created that clause, she says, he cannot now use that clause to defend his bad faith. <u>See</u> Ms. Irish's Mem. 16-17. By holding Mr. Irish liable for violating his duty of good faith, she contends, the Court would be "applying the spirit of the deal as understood by Ms. Irish and

---

[6] Mr. Irish also submitted a memorandum drawing the Court's attention to a recent decision of the Massachusetts Appeals Court that he contends supports his position. Supp. Mem. Law After <u>James Foundation</u> v. <u>Meyers</u> Implied Covenant Good Faith & Fair Dealing, ECF No. 183. The facts of that case, however, are wholly distinguishable from those of the case at bar: whereas this case centers on allegations that the defendant actively hid information from the party to whom he owed a duty of good faith, the decision to which Mr. Irish points merely involves the contractual authority of one party to force the other to sell stock at a particular time. <u>See</u> <u>Robert & Ardis James Found.</u> v. <u>Meyers</u>, 87 Mass. App. Ct. 85 (2015). Given these clear and fundamental differences, the Court sees no reason to discuss the case any further.

as expressed to her by Mr. Irish to Mr. Irish's true interest in NLI." Id. at 17.

Again, the Court agrees with Ms. Irish.  Mr. Irish's side deal creating so-called "phantom equity" and his subsequent repeated representation that he only had a 6% stake in NLI strikes this Court as a case of bad faith.  As the Court sees it, the "spirit of the deal" – what Ms. Irish thought she was agreeing to – was a 20% share of Mr. Irish's interest in the company, which (based on this record) includes the $21,600,000 payment that served as compensation for a hidden ownership stake.  Mr. Irish cannot point to the Separation Agreement's explicit grant to Ms. Irish of a 1.2% stake in NLI as barring this conclusion.  The Court will not allow Mr. Irish to hide behind a shield that he created through his own bad faith.  See Krapf, 439 Mass. at 107 ("[A] court in equity will not sanction voluntary action that amounts to an 'evasion of the spirit of the bargain.' . . . To conclude otherwise would negate a divorcing spouse's high obligation of good faith and fair dealing . . . ."). Accordingly, the Court rules that Mr. Irish is liable to Ms. Irish for his breach of the covenant of good faith and fair dealing.

**IV.  CONCLUSION**

For the foregoing reasons, the Court rules that Mr. Irish is liable to Ms. Irish on Counts II and III of her complaint.

[23]

The Court will schedule further proceedings to determine the scope of the damages, which shall take the form of a constructive trust.  See Nile v. Nile, 432 Mass. 390, 401 (2000).

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE